# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**AURA T. MEDINA**
      **Plaintiff,**

    **v.**                          **Case No. 17-C-1343**

**NANCY A. BERRYHILL,**
**Acting Commissioner of the Social Security Administration**
          **Defendant.**

---

## DECISION AND ORDER

Plaintiff Aura Medina applied for social security disability benefits, alleging that she could no longer work due to a heart problem, cognitive impairment, depression, and anxiety. Denied initially and on reconsideration, she requested a hearing before an Administrative Law Judge ("ALJ"). The ALJ received testimony from plaintiff, a medical expert, and a vocational expert, then issued a decision finding that plaintiff could still perform a range of light, unskilled work, consistent with her past employment as a housekeeper/maid.

In this action for judicial review, plaintiff argues that the ALJ erred in evaluating the credibility of her statements, assigning weight to the various medical opinions in the record, and addressing issues with the vocational expert's testimony regarding the requirements of her past work. While I do not accept all of plaintiff's contentions, there are a number of errors in the ALJ's decision which require remand for further proceedings.

## I. LEGAL STANDARDS

### A. Disability Standard

In determining disability, the ALJ applies a sequential, five-step test. See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At step one, the ALJ asks whether the claimant is currently

working, i.e., engaging in "substantial gainful activity" ("SGA"). If not, he proceeds to step two, determining whether the claimant suffers from any "severe" impairments. An impairment is "severe" if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant has severe impairments, the ALJ decides at step three whether any of those impairments meet or medically equal the requirements of one of the conclusively disabling impairments listed in the regulations (the "Listings").

If the impairments do not meet or equal a Listing, the ALJ proceeds to step four, determining whether the claimant has the residual functional capacity ("RFC") to return to her past relevant work. RFC is the most an individual can still do, on a regular and continuing basis, despite her impairments. SSR 96-8p, 1996 SSR LEXIS 5, at *5. At step four, a claimant will be deemed "not disabled" if it is determined that she retains the RFC to perform the actual functional demands and job duties of a particular past relevant job, or the functional demands and job duties of the occupation as generally required by employers throughout the national economy. SSR 82-61, 1982 SSR LEXIS 31, at *4. In evaluating the job as generally performed, ALJs often utilize the generic job descriptions contained in the <u>Dictionary of Occupational Titles</u> ("DOT"). <u>Id.</u> at *5.

Finally, if the claimant cannot perform her past work, the ALJ will proceed to the fifth and final step, determining whether she can, given her age, education, experience, and RFC, make the adjustment to other work in the national economy. In determining whether a claimant can perform her past or other work, the ALJ may rely on testimony from a vocational expert ("VE"). If the ALJ relies on such testimony at step four or five, he must identify and obtain a reasonable explanation for any conflicts between that testimony and information in the DOT, and explain in his decision how any conflict that has been identified was resolved. SSR 00-4p, 2000 SSR

2

LEXIS 8, at *1.

**B.      Standard of Review**

The court reviews an ALJ's decision to determine whether it applies the correct legal standards and is supported by "substantial evidence." Summers v. Berryhill, 864 F.3d 523, 526 (7th Cir. 2017). Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Id. To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's by re-weighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses. Beardsley v. Colvin, 758 F.3d 834, 836-37 (7th Cir. 2014). If conflicting evidence would allow reasonable minds to differ as to whether a claimant is entitled to benefits, the court must defer to the ALJ's resolution of that conflict. Id. at 837.

Nevertheless, judicial review, while deferential, is not abject. Parker v. Astrue, 597 F.3d 920, 921 (7th Cir. 2010). Remand may be required if the ALJ based his decision on serious factual mistakes or omissions, failed to mention highly pertinent evidence, or because of contradictions or missing premises failed to build an accurate and logical bridge between the evidence and the result. Beardsley, 758 F.3d at 837; Parker, 597 F.3d at 921.

## II.  FACTS AND BACKGROUND

**A.      Summary of Plaintiff's Medical Conditions**

In January 2012, following complaints of palpitations, dyspnea on exertion, and reduced exercise tolerance (Tr. at 488), plaintiff was diagnosed with severe mitral valve insufficiency (Tr. at 424, 492, 593). She underwent open heart mitral valve repair surgery with Dr. Paul

3

Werner in February 2012 (Tr. at 422-28), after which she began complaining of left side numbness, weakness, and fatigue (Tr. at 503). When physical therapy failed to correct the problem, her doctors suspected "something central causing weakness of the left upper extremity," ordering an MRI of the brain (Tr. at 505), which revealed white matter lesions strongly suggestive of demyelinating disease (Tr. at 623). However, an MRI of the cervical spine showed no sign of demyelinating disease, spinal compromise, or nerve root encroachment. (Tr. at 615.)

Dr. Werner also referred plaintiff for a neuro-psychological assessment based on concerns about her cognitive functioning, which Michael Kula, Psy.D., performed on June 7, 2012. (Tr. at 597.) On intelligence testing, her full scale IQ was found to be 72, placing her in the 3rd percentile and the low end of the borderline range of ability. Her various cognitive skills ranged from extremely low to borderline. (Tr. at 598-99.) Dr. Kula concluded that plaintiff demonstrated evidence of cognitive disorder, dysthymic disorder, and an anxiety disorder, with impaired overall intelligence and cognition, impaired academic abilities, and impaired memory abilities. She also demonstrated a moderate level of depression and mild level of anxiety. Dr. Kula concluded:

> At the present time it does appear that she will be unable to meet the cognitive and memory demands required by employment. She is unable to work at this time. She will have difficulty understanding, remembering, and following through with instructions. She will have difficulty completing complete ADLs and IADLs. Even in Spanish language, she will have difficulty with basic reading, spelling, and mathematics. The deficits may be secondary to encephalopathy [due to] health complications.

(Tr. at 599-600.)

Plaintiff subsequently received treatment, including counseling and medication, for anxiety and depression. (E.g., Tr. at 1017-27.) She also received medication and physical

4

therapy for her pain complaints.  (E.g., Tr. at 522, 1252.)

**B.    Plaintiff's Application and Supporting Materials**

Plaintiff applied for benefits in June 2013, alleging a disability onset date of January 31, 2012.  (Tr. at 28, 210).  She reported past work as an assembler and a housekeeper.  (Tr. at 241.)  In a disability report, plaintiff listed a number of conditions limiting her ability to work, including heart problems, high blood pressure, anxiety, sleep problems, and depression.  (Tr. at 252.)  She indicated that she stopped working on January 30, 2012, because of her conditions.  (Tr. at 252.)  In a function report, plaintiff stated that her conditions interfered with movement and caused shortness of breath, fatigue, muscle pain, and forgetfulness.  (Tr. at 262, 267.)  She further reported that she cooked complete meals daily, did some cleaning (Tr. at 264), drove a car (Tr. at 265), and attended church, although she could no longer participate in church activities (Tr. at 266).  Her medications caused drowsiness and impaired her ability to drive.  (Tr. at 269.)

The agency denied the application initially (Tr. at 128), based on a review signed by Pat Chan, M.D., that plaintiff could perform light work with occasional overhead reaching on the left (Tr. at 106), and Kyla King, Ph.D., that despite various "moderate" mental limitations plaintiff was capable of routine, unskilled work (Tr. at 108).  Plaintiff requested reconsideration (Tr. at 132), but the agency maintained the denial based on reviews signed by Mina Khorshidi, M.D. (Tr. at 122) and Roger Rattan, Ph.D. (Tr. at 125), agreeing with the previous assessments (Tr. at 133).  Plaintiff then requested a hearing before an ALJ.  (Tr. at 137.)

**C.    Pre-Hearing Submissions**

In a pre-hearing memorandum, plaintiff objected to reliance on the agency consultants'

5

opinions, as it appeared those consultants simply signed off on the review of an agency examiner. (Tr. at 337.) She relied on a letter from John Brinkman, a former disability examiner and examiner supervisor, who indicated that this was, at the initial and reconsideration levels, a "signature" case, meaning that the medical and psychological consultants did not see the case or have any involvement with it until the "end of the line" when it was assigned to them for review and signature. Brinkman indicated that this usually involves a very quick (five minute or less) review of the examiner's findings and supporting narrative. It does not usually involve more than a cursory review of any medical records and, quite often, the consultant will rely exclusively upon the examiner to summarize the medical evidence. Brinkman explained that consultants do sometimes complete a more in-depth review, but he could tell from the case development worksheet that this was not such a case. (Tr. at 1369.) Plaintiff also raised issues with Dr. Khorshidi's credibility based on her previous discipline for falsely representing herself to be board certified. (Tr. at 338.)

**D.    Hearing**

On March 11, 2016, plaintiff appeared with counsel for her hearing before the ALJ. The ALJ also summoned a medical expert and vocational expert. (Tr. at 60.)

**1.    Plaintiff**

Plaintiff testified that she was 37 years old, 5'1" tall, and 194 pounds. (Tr. at 63.) She lived with her husband, children, and "a girl who helps me with the house stuff." (Tr. at 63-64.) She indicated that she drove very little; sometimes she had trouble because of pain in her arm. (Tr. at 64.) She testified that she previously worked in housekeeping and doing assembly in a factory; she last worked in early 2012 and did not return after her heart surgery. (Tr. at 65,

6

68.)

Plaintiff testified that she did not have problems with her left arm before her heart surgery. (Tr. at 81-82.) After the surgery, she developed pain and loss of strength on the left side, for which she received therapy. (Tr. at 82.) The strength in her left arm and hand was still diminished. She had a hard time opening a bottle with that hand, and constant movement caused fatigue and pain. (Tr. at 83.) For instance, she easily fatigued while washing dishes. A relative came to live with them after plaintiff's surgery, and she helped with the cooking, cleaning, and laundry, and also drove plaintiff's husband to work. (Tr. at 84-85.) Plaintiff also had a friend who helped her, including driving her to the hearing. (Tr. at 88.)

Plaintiff testified that her memory was also much worse after her heart surgery. (Tr. at 86.) For instance, she sometimes got lost when driving or forgot appointments. (Tr. at 86-87.)

**2.    VE**

The VE classified plaintiff's past work as "assembler," DOT # 709.684-014, medium (generally and as plaintiff performed it) and unskilled, and "housekeeper," DOT # 323.687-014, light (generally)[1] and unskilled. (Tr. at 70.) The ALJ asked a hypothetical question, assuming a person capable of light work, with occasional overhead reaching with the left arm; occasional, brief, and superficial contact with coworkers and supervisors, and no contact with the general public; and the sustained concentration for simple work of a routine and repetitive type. (Tr. at 89-90.) The VE testified that such a person could not perform the assembly job but could work as a housekeeper. (Tr. at 90.) Adding a limitation of no fast pace, strict production quotas did not changer the answer. (Tr. at 91.)

---

[1]The VE did not offer an opinion on the exertional level of the housekeeper job as plaintiff performed it. (Tr. at 70.)

On questioning by counsel, the VE agreed that a housekeeper in a hotel would be expected to clean a certain number of rooms, but the VE did not consider that a high-paced production quota. (Tr. at 92.) The VE also agreed that there were multiple tasks involved in cleaning a room, but she still considered it simple, unskilled work with few changes and few steps. (Tr. at 93-94.) Counsel asked if cleaning a hotel room was more complex than, say, working on a packaging line, and the VE responded that even tying one's shoes involved several steps and some degree of judgment. At that point the ALJ stepped in, indicating the questioning had become repetitive and that he "got the point." (Tr. at 94.)

### 3. Medical Expert

The medical expert, Michael Cremerius, Ph.D.,[2] testified that the record established a cognitive impairment, affective disorder, and anxiety disorder, none of which met or equaled a Listing. (Tr. at 71-72.) He indicated that while the record substantiated a cognitive impairment, there was not "a lot of evidence for it"; he cited a statement from Dr. Werner that plaintiff's "memory is intact." (Tr. at 72.) He further indicated that the depression and anxiety were, overall, non-severe. (Tr. at 72.) He testified that these impairments would limit plaintiff to understanding and remembering simple instructions, and performing simple, routine tasks. He also limited her contact with the public to "incidental" and would "probably preclude fast-paced tasks with strict production quotas." (Tr. at 73.)

On cross-examination, Dr. Cremerius acknowledged that Dr. Werner was a cardiovascular surgeon, not a mental health specialist, and that Dr. Werner referred plaintiff for neuro-psychological testing. (Tr. at 73-74.) That testing, performed by Dr. Kula, included

---

[2]Plaintiff stipulated to Dr. Cremerius's qualifications. (Tr. at 71.)

8

several extremely low scores. (Tr. at 74-76.) However, Dr. Kula responded that he could pick out scores that were higher, and that his testimony was based on and consistent with her overall performance. (Tr. at 77.) Counsel asked if Dr. Cremerius disagreed with Dr. Kula's conclusion that plaintiff would be unable to meet the cognitive and memory demands required by employment, and Dr. Cremerius responded that the restrictions he offered were "generally consistent" with Dr. Kula's review, as well as the rest of the file evidence. (Tr. at 78.)

### E. Post-Hearing Submissions

After the hearing, the VE completed vocational interrogatories,[3] indicating that her answers at the hearing were not inconsistent with the DOT. She stated that the DOT did not discuss issues such as the amount or type of interaction with other people, use of the dominant versus non-dominant hand, production pace or quotas, the number of steps in a job, or specifics related to judgment required to complete job tasks. These responses came from her experience in analyzing and placing people in jobs. (Tr. at 355.)

Plaintiff also filed post-hearing submissions, including a March 29, 2016 report from Jay Pludeman, M.D., her primary care physician, indicating that due to combination of progressive fatigue and dyspnea, along with chronic left arm and neck pain and weakness, plaintiff was limited to less than sedentary work. Specifically, Dr. Pludeman opined that plaintiff could lift no more than 10 pounds; sit for four hours, stand for 30 minutes, and walk for 15 minutes in an eight-hour day; use her left arm and hand only occasionally due to chronic pain and weakness; and never engage in a number of postural activities (stooping, kneeling, crouching, crawling). (Tr. at 1407-10.) Dr. Pludeman also included a number of environmental limitations,

---

[3]Plaintiff did not object to the addition of these responses to the record. (Tr. at 364.)

explaining that chronic pain and her heart condition could limit reaction times. (Tr. at 1411.) He indicated that these limitations applied since early 2012. (Tr. at 1412.)

Plaintiff also filed an April 6, 2016 statement from Dr. Leon Rosen, her cardiologist. Dr. Rosen indicated that he had reviewed the housekeeping/maid job description, and that based on recent cardiac stress testing plaintiff could perform this work on a full-time basis. (Tr. at 1416.)

Finally, plaintiff filed an April 19, 2016 report from Dr. Kula, endorsing moderate limitations in plaintiff's ability to handle simple instructions, marked limitations in her ability to make simple work-related decisions, and extreme limitations in more complex matters. Dr. Kula based these limitations on plaintiff's limited intellectual capabilities and equally impaired cognitive skills. (Tr. at 1419.) He assessed mild limitations in her ability to interact appropriately with the public, moderate limitations in interacting with coworkers and supervisors, and marked limitations in her ability to respond to usual work situations and changes in a routine work setting. He explained that plaintiff would have difficulty with cognitive flexibility, particularly being able to change routines, alter methods of interaction, and react appropriately to unexpected responses. He indicated that these limitations had been present since 2012. (Tr. at 1420.)

Plaintiff argued in a post-hearing brief that Dr. Cremerius's opinion was based on a cursory review of the record, and that his testimony should be discounted given "his long term financial friendship with the Social Security Administration." (Tr. at 369.) Plaintiff further argued that, while the VE claimed her testimony did not conflict with the DOT, according to that source a housekeeper "renders personal assistance to patrons," which conflicted with the "no public contact" limitation in the hypothetical question. (Tr. at 369-70.)

10

**F.    ALJ's Decision**

On July 1, 2016, the ALJ issued an unfavorable decision.  The ALJ determined at step one that plaintiff had not engaged in SGA from the alleged onset date of January 31, 2012, through her date last insured of September 30, 2015.  At step two, he found that she had the severe impairments of valvular heart disorder, a cognitive impairment, depression, and anxiety. (Tr. at 30.)  The ALJ concluded at step three that none of plaintiff's impairments met or equaled a Listing.  (Tr. at 31-33.)

Prior to step four, the ALJ determined that plaintiff had the RFC to perform light work (lifting 10 pounds frequently and 20 pounds occasionally, sitting six hours in an eight-hour day, and standing six hours in an eight-hour day); occasionally reaching overhead with the left arm; having occasional brief and superficial contact with coworkers and supervisors, but no contact with the general public; and with the sustained concentration, persistence, or pace necessary for simple work of a routine and repetitive type.  He indicated that in making this finding he considered plaintiff's statements regarding her symptoms and their limiting effects, and the medical opinion evidence.  (Tr. at 33.)

Plaintiff alleged that she could not perform basic work activities primarily due to her heart condition, which caused limitations in movement, shortness of breath, and fatigue.  Plaintiff reported that she is right handed and had no difficulty with driving except that at times her arm hurt.  She further stated that she had left arm pain and received help from a family member with household chores and driving.  (Tr. at 33.)

The ALJ concluded that while plaintiff's impairments could reasonably be expected to cause the alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical and other evidence in

11

the record. In support, the ALJ first reviewed the medical evidence, noting that prior to the alleged onset date plaintiff had a history of valvular heart disease, which caused chest pain and, at times, a murmur. She later developed dyspnea and palpitations. In February 2012, she underwent an open heart mitral valve repair. She then underwent cardiac rehabilitation therapy and was able to increase her stamina and endurance. Follow-up exams and tests were generally normal, and she continued to treat her condition with medication and no further surgical intervention. (Tr. at 34.)

Plaintiff's physical symptoms also included pain and left upper extremity weakness, for which she initially received physical therapy. A June 2012 brain MRI showed white matter lesions indicating a demyelinating disease, but an August 2012 MRI of the cervical spine did not show signs of a demyelinating disease, spinal canal compromise, or nerve root encroachment. Plaintiff generally treated this condition with physical therapy and medication, including opioid pain medication. (Tr. at 35.)

Plaintiff's mental symptoms included some difficulties with memory, anxiety, and at times a dysphoric mood. In June 2012, she underwent a neuro-cognitive evaluation, which indicated a full-scale IQ of 72. Other tests indicated that she was generally in the low average to borderline range of functioning for learning and working memory. However, she sought no further treatment under May 2013, when she presented for evaluation of anxiety and began medication management and counseling. Her symptoms waxed and waned, but she had general improvement in anxiety and depressive moods. (Tr. at 35.)

In a pre-hearing report, plaintiff listed medication side effects, including drowsiness, but the record generally indicated that she did not report side effects to her prescribers. She also reported driving her husband to and from work, despite this drowsiness. The ALJ concluded

12

that to the extent plaintiff did experience such a medication side effect, the RFC accommodated it by limiting her to simple, routine, and repetitive work. (Tr. at 35.)

The ALJ noted that the record otherwise reflected that plaintiff had good range of motion of the bilateral upper extremities, normal strength, gait, and coordination, and ambulated without an assistive device. (Tr. at 35.) The records also often noted that her memory, executive functions, and problem-solving skills were not impaired. (Tr. at 36.)

The ALJ further noted that the record reflected statements and activities that were not consistent with the allegations of impairments of disabling severity. Plaintiff often did not complain of chest pain or shortness of breath. She reported that she paid too much attention and focused, which caused her stress, contrary to the claim of decreased concentration. She also reported that she could drive a car, made complete meals on a daily basis, and could go out alone; she indicated that she went to church on a regular basis and did not need someone to accompany her. At the hearing, plaintiff testified that a family member drove her husband to work, but she previously told a counselor that she did that; she further stated that she was "content with life." (Tr. at 36.)

As for the opinion evidence, the ALJ gave "some weight" to the opinions of the agency medical consultants, who opined that plaintiff could do light work with occasional reaching overhead with the left arm, and the agency psychological consultants, who opined that plaintiff could perform routine, unskilled work. The ALJ found that these opinions were based on a review of the objective evidence with social security program knowledge and were generally consistent with the overall hearing level record, including the records reflecting ongoing upper extremity weakness but otherwise normal gait and strength and some difficulty with recent memory. Plaintiff challenged the consultants' opinions with Brinkman's statement that the

13

consultants conducted only a cursory review before affirming an agency examiner's findings. The ALJ gave Brinkman's "statements little weight because the records reflect a detailed explanation for [the consultants'] limitations. Even more, their explanation and opinions are generally consistent with the overall hearing level record, as detailed above." (Tr. at 36, internal record citation omitted.)

The ALJ gave "some weight" to Dr. Cremerius's opinion, accepting his conclusion that plaintiff was limited to simple and routine tasks, and limited contact with the public, as Dr. Cremerius was an objective third party who evaluated the hearing level record and was subject to extensive questioning by plaintiff's lawyer. (Tr. at 36-37.) However, the ALJ gave less weight to Dr. Cremerius's opinion that plaintiff could not handle fast-paced tasks with strict production quotas, noting that while the record reflected that plaintiff had some difficulties with recent memory her attention and concentration were often found not be impaired. Otherwise, the RFC was consistent with Dr. Cremerius's opinion. (Tr. at 37.) The ALJ overruled plaintiff's objection to Dr. Cremerius's testimony due to his financial relationship with the agency, noting that plaintiff's counsel extensively questioned Dr. Cremerius and stipulated to his qualifications at the hearing. Further, Dr. Cremerius explained that his opinions were based on the overall record, including all of the plaintiff's test scores, not just certain poor scores. (Tr. at 37.)

The ALJ next addressed the two reports from Dr. Kula. In June 2012, Dr. Kula opined that plaintiff could not meet the cognitive and memory demands required by employment. In April 2016, Dr. Kula indicated moderate to extreme limitations in concentration, persistence, and pace; mild to marked limitations in social functioning; and moderate limitations in understanding, remembering, and carrying out even simple instructions. The ALJ gave Dr. Kula's statements some weight. He first noted that Dr. Kula was not an ongoing treatment

14

provider, as he evaluated plaintiff in person just once (in June 2012) and nothing indicated that he reviewed other records. The ALJ credited his opinion that plaintiff's cognitive disorder had an impact on memory, changing routines, and altering methods of interaction. However, his indications of marked to extreme problems with concentration, persistence, and pace were not consistent with the overall hearing level record. The ALJ gave Dr. Kula's assessment of severity less weight that Dr. Cremerius's, as the latter had the benefit of reviewing the entire record. (Tr. at 37.)

Dr. Pludeman, plaintiff's primary care physician, indicated that plaintiff had a less than sedentary exertional ability, with additional postural, manipulative, and environmental limitations, basing these limitations on pain, fatigue, and shortness of breath. The ALJ gave Dr. Pludeman's opinions little weight, as they were inconsistent with the records, which contained few clinical findings or complaints by plaintiff corresponding to his opinions. Rather, his records showed that plaintiff often did not complaint of chest pain or shortness of breath, plaintiff lungs were often clear, and she had normal heart rate and rhythm. Further, although Dr. Pludeman had given extreme limitations, he often encouraged plaintiff to perform regular exercise. (Tr. at 38.)

The record also contained a statement from Dr. Rosen, plaintiff's cardiologist, in which he indicated that plaintiff could perform full-time work as a housekeeper/maid. The ALJ gave this statement great weight, as Dr. Rosen was an ongoing treatment provider specializing in cardiology, the area of medicine covering plaintiff's primary impairment. The ALJ noted that at one point plaintiff reported to a provider that a Dr. "Roga" or "Rosa" instructed her not to vacuum or lift more than eight pounds. (Tr. at 38, citing Tr. at 647.) However, the record did not reflect any treatment from this person, nor was the record consistent with this statement,

15

as plaintiff generally had normal gait, coordination, and strength. The ALJ considered whether Dr. Rosen gave the restriction on vacuuming or lifting more than eight pounds, but found this statement inconsistent with Dr. Rosen's view that plaintiff could perform the duties of a housekeeper. He therefore gave this reported statement little weight. (Tr. at 38.)

In sum, the ALJ found that while plaintiff's impairments were severe, they did not preclude her from performing basic work activities. He found the assessed RFC supported by the objective findings, opinions of the agency consultants, medical expert, and Dr. Rosen. (Tr. at 39.)

At step four, the ALJ determined that plaintiff could perform her past work as a housekeeper, as generally performed. The VE testified that a person limited to light, unskilled work, with occasional overhead reaching, could do this job. The VE further indicated that this position could be performed with no contact with the general public and only occasional interaction with coworkers and supervisors. (Tr. at 39.) After the hearing, plaintiff argued that the VE's testimony conflicted with the DOT regarding the amount of public contact required. However, the VE reported that her testimony was not inconsistent with the DOT, and that she relied on her own experience. (Tr. at 39-40.) The ALJ accordingly found plaintiff not disabled. (Tr. at 40.)

The Appeals Council denied plaintiff's request for review on May 19, 2017, making the ALJ's decision the final word from the agency on the application. See Stephens v. Berryhill, 888 F.3d 323, 327 (7th Cir. 2018). This action followed.

16

## III. DISCUSSION

**A.     Plaintiff's Statements**

In evaluating a claimant's statements regarding her symptoms, the ALJ must first determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the alleged symptoms.  SSR 16-3p, 2016 SSR LEXIS 4, at *5.  If the claimant has such an impairment, the ALJ must then evaluate the intensity and persistence of the symptoms to determine the extent to which they limit the claimant's ability to work.  Id. at *9.  If the statements are not substantiated by objective medical evidence, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms based on the entire record and considering a variety of factors, including the claimant's daily activities; the location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes; and treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms.  Id. at *18-19.  The ALJ's decision must "contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."  Id. at *26.  The court reviews an ALJ's evaluation of the claimant's statements deferentially, reversing only if it is "patently wrong."  See, e.g., Gerstner v. Berryhill, 879 F.3d 257, 264 (7th Cir. 2018).

Plaintiff argues that the ALJ ignored much of her testimony, noting only her statements that at times her arm hurt and that a family member helped with driving and chores.  (Pl.'s Br. at 7-8, Pl.'s Rep. Br. at 2, citing Tr. at 33, 35.)  She notes that she offered additional testimony

17

regarding her left arm limitations and concentration difficulties.  (Pl.'s Br. at 8.)

Plaintiff's argument ignores the court's obligation to read the ALJ's decision as a whole. See, e.g., Curvin v. Colvin, 778 F.3d 645, 650 (7th Cir. 2015).  While plaintiff quotes from one part of the ALJ's decision in which he summarized her allegations (Pl.'s Br. at 8, quoting Tr. at 33), she overlooks other portions of the opinion in which the ALJ discussed her treatment for and statements to her providers regarding her cardiac symptoms (Tr. at 34); the nature and effectiveness of the treatment she received for her reported left upper extremity pain and weakness (Tr. at 35);[4] her treatment for, and reported improvement in, her anxiety and depressive symptoms (Tr. at 35); and her reported medication side effects (Tr. at 35).  The ALJ also cited evidence and statements that he deemed inconsistent with plaintiff's claims of disabling symptoms, including exams showing good range of motion, normal strength, and normal cardiovascular findings (Tr. at 35-36); records in which plaintiff did not complain of chest pain or shortness of breath (Tr. at 36); and a notation that plaintiff felt too attentive and focused, contrary to her claim of diminished concentration (Tr. at 36).  The ALJ further discussed plaintiff's daily activities, including driving, making complete meals, and going to church on a regular basis unaccompanied.  The ALJ acknowledged plaintiff's hearing testimony

---

[4]In reply, plaintiff argues that the ALJ failed to evaluate the effectiveness of treatment and therapy for her left arm.  (Pl.'s Rep. Br. at 2.)  That is incorrect.  The ALJ stated: "She initially had physical therapy for a left rotator cuff syndrome which improved the shoulder pain but she continued to have weakness and numbness."  (Tr. at 35.)  Plaintiff also faults the ALJ for failing to specifically discuss her testimony that she could not open a jar or bottle with her left hand, and that she fatigued washing dishes.  (Pl.'s Rep. Br. at 2, citing Tr. at 84.)  The ALJ is not required to address every piece of testimony in the record and need only build a bridge from the evidence to his conclusion.  Pepper v. Colvin, 712 F.3d 351, 362 (7th Cir. 2013).  The ALJ accepted that plaintiff had limitations in the use of her left (non-dominant) upper extremity (Tr. at 35), but noted that these limitations did not prevent her from engaging in activities such as preparing complete meals daily (Tr. at 36).

18

that her family member drove her husband to work,[5] but he cited a therapy note in which plaintiff said she dropped off and picked up her husband from work. (Tr. at 36, citing Tr. at 1236.)

Plaintiff further argues that the ALJ provided only a conclusory evaluation, writing that her statements were "not entirely consistent" with the record. (Pl.'s Br. at 9-10, citing Tr. at 34.) As the Seventh Circuit has noted, "the simple fact that an ALJ used boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if he otherwise points to information that justifies his credibility determination." Pepper, 712 F.3d at 367-68. As summarized above, the ALJ provided several reasons for his finding here.

Plaintiff also contends that, while the ALJ cataloged the medical evidence and discussed portions of her written reports, he did not explain how that evidence disproved her statements; nor did he explain how her daily activities proved the capacity for sustained, regular work. (Pl.'s Br. at 10-11.) There is no requirement that "an ALJ in a non-adversary proceeding . . . conclusively refute each subjective complaint of pain and disability a claimant makes." Boeck v. Berryhill, No. 16-C-1003, 2017 U.S. Dist. LEXIS 161683, at *52 (E.D. Wis. Sept. 30, 2017); see also Books v. Chater, 91 F.3d 972, 980 (7th Cir. 1996) (holding that the ALJ need not evaluate in writing every piece of testimony submitted, but only sufficiently articulate his assessment to assure the court that he considered the important evidence). And, while the

---

[5]Plaintiff argues in reply that the ALJ failed to properly evaluate this assistance from her family member. (Pl.'s Br. at 2.) However, the ALJ contrasted plaintiff's testimony that the relative drove her husband with her admission to a therapist that she had performed this task. Plaintiff also faults the ALJ for failing to discuss certain examples of her memory problems. (Pl.'s Rep. Br. at 2.) Again, the ALJ was not required to discuss every piece of testimony, and as with the left arm impairment, he accepted that plaintiff had some difficulties in this area, limiting her "to simple, routine, and repetitive work because of her decreased ability to remember from her cognitive impairment." (Tr. at 35.)

19

Seventh Circuit has criticized the agency's "deplorable" tendency to equate activities of daily living with full-time work, Bjornson v. Astrue, 671 F.3d 640, 647 (7th Cir. 2012), there is nothing wrong with considering such activities in determining whether the claimant's symptoms are of "disabling severity" (Tr. at 36), as the ALJ did here. See, e.g., Reed v. Colvin, 656 Fed. Appx. 781, 787 (7th Cir. 2016) ("[A]lthough the ALJ summarized Reed's testimony about her ability to do housework and other tasks, she never inferred from those statements that Reed was capable of full-time work."); Loveless v.Colvin, 810 F.3d 502, 508 (7th Cir. 2016) (noting that ALJ discussed claimant's performance of activities of daily living but did not equate it with ability to work); Pepper, 712 F.3d at 368 (considering daily activities as part of the analysis).[6]

Plaintiff concludes that, if accepted, her testimony could result in a disability finding. (Pl.'s Br. at 12.) Although a claimant can establish the severity of her symptoms by her own testimony, her subjective complaints need not be accepted insofar as they clash with other evidence in the record. Arnold v. Barnhart, 473 F.3d 816, 823 (7th Cir. 2007). The court must defer to an ALJ's finding that the claimant's statements conflict with the record, so long as it is adequately explained and supported by substantial evidence. Id.; see also Schreiber v.

---

[6]In reply, plaintiff argues that the Commissioner's response that the ALJ did not equate activities with full-time work is an admission that the ALJ never said anything about full-time work in his decision. (Pl.'s Rep. Br. at 2-3.) That is incorrect. The ALJ adopted an RFC consistent with a regular work schedule (Tr. at 33), and he gave great weight to the opinion of Dr. Rosen that plaintiff could perform the duties of a housekeeper "on a regular full-time basis." (Tr. at 38.) Plaintiff notes that in a competitive workplace no relative would be there to help her. (Pl.'s Rep. Br. at 3.) As indicated, the ALJ considered the reported assistance plaintiff received from the family member at home. (Tr. at 33.) Plaintiff further argues in reply that the ALJ merely cataloged the evidence without making an explicit credibility finding. (Pl.'s Rep. Br. at 3.) But the ALJ did not simply state that the "allegations have been considered," as in the case plaintiff cites. (Pl.'s Br. at 10, Pl.'s Rep. Br. at 3, citing Brindisi v. Barnhart, 315 F.3d 783, 787 (7th Cir. 2003).) Rather, he followed the required process of considering whether plaintiff's symptoms could reasonably be accepted as consistent with the objective medical and other evidence in the record. (Tr. at 33, citing 20 C.F.R. § 404.1529.)

20

Colvin, 519 Fed. Appx. 951, 961 (7th Cir. 2013) ("[T]he use of [boilerplate] language is not fatal if the ALJ has otherwise explained his conclusion adequately. Here, as discussed above, the ALJ did offer reasons grounded in the evidence, and we conclude that the ALJ satisfied his minimal duty to articulate his reasons and make a bridge between the evidence and his credibility determination.") (internal citations and quote marks omitted).

## B.    Opinion Evidence

The ALJ must consider all "medical opinions" in the record. Roddy v. Astrue, 705 F.3d 631, 636 (7th Cir. 2013). A "medical opinion" is a statement from an "acceptable medical source" that reflects judgments about the nature and severity of the claimant's impairments, including her symptoms, diagnosis and prognosis, what she can still do despite her impairments, and her physical or mental restrictions. 20 C.F.R. § 404.1527(a)(1). "Acceptable medical sources" are licensed physicians, licensed or certified psychologists, licensed optometrists (for the measurement of visual acuity and visual fields), licensed podiatrists (for purposes of establishing impairments of the foot or ankle), and qualified speech-language pathologists (for purposes of establishing speech or language impairments). SSR 06-3p, 2006 SSR LEXIS 5, at *3-4.

Under the regulations application to plaintiff's claim,[7] the opinion of a claimant's treating physician "is entitled to controlling weight if it is well supported by medical findings and is consistent with other evidence in the record." Gerstner v. Berryhill, 879 F.3d 257, 261 (7th Cir. 2018). If the ALJ declines to give a treating source opinion controlling weight, he must decide

---

[7]The Commissioner recently modified her regulations regarding the evaluation of medical opinions. However, because plaintiff filed her application prior to March 27, 2017, I cite the old regulations and Rulings in this decision. See 20 C.F.R. § 404.1527.

how much weight the opinion does deserve, considering a checklist of factors including the length, nature, and extent of the treatment relationship; the extent to which the opinion is supported by relevant evidence; the consistency of the opinion with the record as a whole; and whether the treating physician is a specialist in the relevant area. Scrogham v. Colvin, 765 F.3d 685, 697 (7th Cir. 2014); see also Bauer v. Astrue, 532 F.3d 606, 608 (7th Cir. 2008) (stating that when the treating physician's opinion is not given controlling weight "the checklist comes into play"). The ALJ must always offer "good reasons" for discounting the opinion of a treating physician. Israel v. Colvin, 840 F.3d 432, 437 (7th Cir. 2016).

Nevertheless, while a treating physician's opinion is important, it is not the final word on a claimant's disability. Schmidt v. Astrue, 496 F.3d 833, 842 (7th Cir. 2007). The ALJ may, for instance, discount a treating physician's medical opinion if it is internally inconsistent, conflicts with the provider's own treatment notes, or is based entirely on the claimant's subjective complaints. See, e.g., Loveless, 810 F.3d at 507; Ketelboeter v. Astrue, 550 F.3d 620, 625 (7th Cir. 2008).

The ALJ is also required to evaluate the opinions of agency medical and psychological consultants. While such consultants lack a treating source's familiarity with the particular case at hand, they may bring impartiality, expertise in disability evaluation, and knowledge of similar cases. Books, 91 F.3d at 979. The ALJ evaluates consultant opinions based on the expert's medical specialty and understanding of social security disability programs, the consistency of the opinion with the evidence of record, and the explanation offered for the opinion. Haynes v. Barnhart, 416 F.3d 621, 630 (7th Cir. 2005); 20 C.F.R. § 404.1527(c).

**1.    Dr. Pludeman**

Plaintiff argues that the ALJ erred in discounting the report from her treating physician,

22

Dr. Pludeman. (Pl.'s Br. at 12.) She first contends that the ALJ failed to apply the checklist and explain what other weight the opinion deserved if not controlling weight. (Pl.'s Br. at 13.) As indicated above, the ALJ considered Dr. Pludeman's status as plaintiff's primary care physician, reviewed the treatment history, and noted the lack of support for the report in the doctor's own treatment notes; he also found the extreme limitations Dr. Pludeman recommended inconsistent with the doctor's encouragement of regular exercise. Based on these factors, he decided to give the report "little weight." (Tr. at 38.)

Plaintiff further argues that the ALJ cherry picked from the record in order to find inconsistency; she cites a number of records documenting her reports of left arm pain, numbness, and weakness; occasions in which she experienced sinus tachycardia during cardiac rehabilitation; examinations in which she demonstrated weakened grip strength on the left; continued left arm symptoms despite physical therapy; her receipt of narcotic pain medication; and her complaints of depression, anxiety, and memory problems. (Pl.'s Br. at 13-15.) The ALJ generally considered this evidence. (Tr. at 35 – complaints of left upper extremity pain, with continued weakness and numbness despite therapy; 34 – plaintiff's course of cardiac rehabilitative therapy; 35 – treatment for left upper extremity problems with physical therapy and medications; 35 – reports of difficulties with memory, anxiety, and dysphoric mood.) He also cited evidence he believed contradicted Dr. Pludeman's opinion. A reviewing court may not re-weigh the evidence or substitute its judgment for that of the ALJ. Skarbek v. Barnhart, 390 F.3d 500, 503 (7th Cir. 2004); see also Elder v. Astrue, 529 F.3d 408, 415 (7th Cir. 2008) ("If the ALJ discounts the physician's opinion after considering [the checklist] factors, we must allow that decision to stand so long as the ALJ minimally articulate[d] his reasons – a very deferential standard that we have, in fact, deemed lax.") (internal quote marks omitted).

23

Plaintiff next argues that the ALJ "played doctor" in finding her allegations unsupported by objective medical evidence. (Pl.'s Br. at 15, Pl.'s Rep. Br. at 4).) While an ALJ is not allowed to make his own independent medical findings, e.g., Rohan v. Chater, 98 F.3d 966, 970 (7th Cir. 1996), the applicable regulations require the ALJ to consider the objective medical evidence in evaluating both the credibility of the claimant's statements and in determining whether a treating source report is entitled to controlling weight. "An ALJ does not play doctor by following the regulations." Corder v. Berryhill, No. 17-C-0779, 2018 U.S. Dist. LEXIS 107153, at *63 (E.D. Wis. June 27, 2018); see also Thorps v. Astrue, 873 F. Supp. 2d 995, 1006 (N.D. Ill. 2012) ("That's not playing doctor, that's weighing the evidence."). Further, the ALJ considered and relied on expert medical opinions, including the statement from plaintiff's treating cardiologist, in reaching his decision here. See Dixon v. Massanari, 270 F.3d 1171, 1177 (7th Cir. 2001) ("The cases in which we have reversed because an ALJ impermissibly 'played doctor' are ones in which the ALJ failed to address relevant evidence.").

Finally, plaintiff contends that the ALJ missed the point that Dr. Pludeman was treating her for fibromyalgia, a rheumatic disease, not a cardiac or orthopedic one. (Pl.'s Br. at 16, citing Tr. at 1332-34.) She argues that the records emphasized by the ALJ regarding chest pain, shortness of breath, and normal heart rate and rhythm are not related to evaluation of fibromyalgia. See Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996) ("Since swelling of the joints is not a symptom of fibromyalgia, its absence is no more indicative that the patient's fibromyalgia is not disabling than the absence of headache is an indication that a patient's prostate cancer is not advanced."). She further notes that, because exercise is common treatment option recommended for people with fibromyalgia, see Brown v. Colvin, No. 15-cv-1246, 2016 U.S. Dist. LEXIS 132034, at *30-31 (C.D. Ill. Sept. 27, 2016), the ALJ should

24

not have found that Dr. Pludeman's encouragement of exercise contradicted his proposed limitations.

While Dr. Pludeman referenced fibromyalgia in treatment notes, he did not mention that condition in his report. More significantly, <u>plaintiff</u> never mentioned this condition in her pre-hearing reports or in her testimony at the hearing. Given the inquisitorial nature of social security hearings, courts have declined to apply waiver when a claimant fails to raise an issue at the administrative hearing, <u>see, e.g.</u>, <u>Moore v. United States SSA</u>, No. 16-cv-365-PB, 2017 U.S. Dist. LEXIS 80242, at *9 (D.N.H. May 25, 2017) (citing <u>Sims v. Apfel</u>, 530 U.S. 103, 110-14 (2000)); nevertheless, the Seventh Circuit has noted that where, as here, the claimant is represented "by counsel at the hearing, she is presumed to have made her best case before the ALJ." <u>Summers</u>, 864 F.3d at 527. Plaintiff argues that she met her duty of presenting evidence of the fibromyalgia diagnosis, and it was up to the ALJ to properly evaluate that evidence. (Pl.'s Rep. Br. at 6.) But even now, in this court, plaintiff develops no argument that the ALJ erred in failing to find fibromyalgia to be a severe impairment under the criteria in SSR 12-2p.[8]

---

[8]In reply, plaintiff faults the ALJ for citing records related to her cardiac condition, when Dr. Pludeman was treating her for pain. (Pl.'s Rep. Br. at 5.) But Dr. Pludeman clearly relied on plaintiff's heart condition (Tr. at 1411, 1412) and associated symptoms of dyspnea (Tr. at 1407) and shortness of breath (Tr. at 1410) in his report. Plaintiff further notes that Dr. Pludeman provided narcotic pain medication given the severity of plaintiff's non-cardiac conditions. (Pl.'s Rep. Br. at 5, citing Tr. at 1242.) As discussed above, the ALJ acknowledged plaintiff's use of opioids, as well as her alleged medication side effects. (Tr. at 35.) It is also worth noting that in the treatment record plaintiff cites Dr. Pludeman documented mild soreness, no acute joint tenderness, and good arm and shoulder range of motion, although her neck muscles were tense (Tr. at 1242), findings consistent with other records cited by the ALJ reflecting some muscle tension but good range of motion and normal strength (Tr. at 35, citing Tr. at 994, 970, 974, 1347, 1355). Plaintiff notes Dr. Pludeman's statement that her cardiac disease was progressing, likely requiring surgery. (Pl.'s Rep. Br. at 5; Tr. at 1412.) But as the ALJ noted, a few weeks later treating cardiologist Dr. Rosen opined that "based upon recent

## 2. Dr. Rosen

Plaintiff argues that the ALJ gave great weight to Dr. Rosen's opinion that she could perform her past work as a housekeeper but arbitrarily rejected Dr. Rosen's opinion that she could not vacuum or lift more than eight pounds. (Pl.'s Br. at 16-17.) The argument is based on the premise that Dr. Rosen actually gave the latter opinion. However, the record includes no report or treatment note from Dr. Rosen imposing such restrictions. Rather, as the ALJ discussed, on April 10, 2012 – about two months after her heart surgery – plaintiff reported to a physical therapist that a "Dr. Rosa" or "Roga" told her not to vacuum or lift more than eight pounds.[9] (Tr. at 38, 647.) The ALJ noted that the record did not reflect any treatment from Rosa/Roga and, in any event, such a limitation conflicted with the other evidence in the record. The ALJ considered whether this statement actually came from Dr. Rosen, but he found the statement inconsistent with Rosen's opinion that plaintiff could perform the duties of a housekeeper, including moving furniture, carrying linens, and rolling carpets, on a full-time basis.[10] (Tr. at 38.)

---

cardiac stress testing" plaintiff could work as a housekeeper on a regular full time basis. (Tr. at 1416; Tr. at 38.) Finally, plaintiff makes the fair point that the ALJ never established what sort of exercise Dr. Pludeman recommended, nor did he explain how it contradicted the doctor's limitations. (Pl.'s Rep. Br. at 6.) While this alone might not support reversal, the ALJ should address this issue on remand.

[9]The note is handwritten and hard to read.

[10]As the Commissioner notes, the ALJ did not conclusively state that the vacuuming and eight-pound restriction came from Dr. Rosen but rather was being thorough when he addressed the possibility that Rosen gave those restrictions. (Def.'s Br. at 11.) In reply, plaintiff argues that the record contains treatment notes from Dr. Rosen, which the ALJ did not discuss, that could support these restrictions. (Pl.'s Rep. Br. at 7, citing Tr. at 1212-17.) However, nowhere in these notes did Dr. Rosen say that plaintiff could not vacuum or lift more than eight pounds. In his final note, Dr. Rosen assessed stable dyspnea, no more chest pain, recommending weight loss with diet and follow up in six months or as needed. (Tr. at 1217.) Despite

26

Plaintiff further argues that the ALJ provided no reasoning for his decision (Pl.'s Br. at 17), but that is incorrect. In giving Dr. Rosen's opinion that plaintiff could perform her past work great weight, the ALJ noted that Dr. Rosen was an ongoing treatment provider, specializing in cardiology, the area of medicine covering plaintiff's primary impairment. (Tr. at 38.) The ALJ also noted that the vacuuming/eight-pound lifting limitation – regardless of where it came from – had no support in the record, including Dr. Rosen's opinion that plaintiff could perform the functions of the housekeeper job, which plainly involve cleaning and lifting more than eight pounds. (Tr. at 38.)

Finally, plaintiff argues that the ALJ signaled that he was confused and incorrectly believed that the record contained no treatment records from Dr. Rosen. (Pl.'s Br. at 17.) Plaintiff misreads the decision. The ALJ noted that the record contained nothing from Rosa/Roga; he understood that Dr. Rosen was the treating cardiologist. Plaintiff cites various records from 2015 in which she complained to Dr. Rosen of chest pain, shortness of breath, and dyspnea. (Pl.'s Br. at 17.) Nevertheless, Dr. Rosen offered an opinion on April 6, 2016, shortly after the hearing, that based on recent cardiac testing plaintiff could work full-time as a housekeeper. Plaintiff develops no argument that the ALJ was obligated to reject Dr. Rosen's clearly stated opinion that she could work as a housekeeper based on a lay evaluation of these earlier treatment notes.

**3.      State Agency Consultants**

Plaintiff first argues that the ALJ failed to consider the regulatory factors (e.g., treatment

---

continuing to claim that the ALJ made the arbitrary choice to credit one of Dr. Rosen's opinions rather than the other (Pl.'s Rep. Br. at 8), plaintiff is unable to cite any record evidence showing that Dr. Rosen ever imposed a vacuuming or eight-pound lifting restriction.

relationship, supportability/consistency, and specialization) in evaluating the agency consultants' reports. (Pl.'s Br. at 18.) However, the ALJ acknowledged that these reports were based on a record review (rather than examination), and that the hearing level record contained additional materials the consultants did not see. He gave the reports "some weight" as the consultants had social security program knowledge and their opinions were generally consistent with the overall hearing level record. (Tr. at 18.)

Plaintiff's more substantial argument relies on Brinkman's statement that this was a "signature" case in which the consultants did little more than endorse the conclusions of an agency examiner. Plaintiff argues that because these reports are not the product of medical reasoning and analysis by an acceptable medical source, they should not be given any weight. (Pl.'s Br. at 18-19.) If Brinkman is correct about how this case was reviewed, plaintiff's argument appears to have merit.

Unfortunately, the ALJ failed to determine if Brinkman was correct. Rather, he gave Brinkman's statements little weight because the consultants provided detailed explanations for their opinions, which were also generally consistent with the overall hearing level record. (Tr. at 36.) This is a non-sequitor. If these reports were prepared by a layperson, rather than a doctor, they do not qualify as medical opinions regardless of their quality or consistency with the other evidence.[11] See 20 C.F.R. §§ 404.1527, 404.1513.

The ALJ did not rely solely on the consultants' reports in determining RFC; he also cited

─────────────────────

[11]In this sense, the ALJ did "miss the point" of Brinkman's statement. (See Def.'s Br. at 12.) Brinkman did not contend that the consultants' reports lacked detail or conflicted with the record, but rather that the consultants did not actually prepare them. The ALJ never confronted this issue, which does not involve disagreement with the weight given opinion evidence but whether these reports qualified as a medical opinions in the first place.

the opinions of Drs. Rosen and Dr. Cremerius. However, the Commissioner develops no argument that any reliance on the consultants was harmless and, as discussed below, there are also issues with the ALJ's evaluation of Dr. Cremerius's testimony.[12] Therefore, the matter must be remanded.[13]

### 4. Dr. Kula v. Dr. Cremerius

Plaintiff contends that the ALJ erred in giving greater weight to the testimony of Dr. Cremerius than to the reports from Dr. Kula. (Pl.'s Br. at 20.) As indicated above, the ALJ considered Dr. Cremerius an "objective third party" who had the benefit of reviewing the entire record and was subject to extensive questioning by plaintiff's counsel, while Dr. Kula was not an ongoing treatment provider, evaluated plaintiff in person just once (in June 2012), and nothing indicated that he reviewed other records. (Tr. at 37.)

Plaintiff argues that while Dr. Cremerius said he reviewed the medical records provided to him (Tr. at 71), his testimony revealed a shaky understanding of the case. For instance, he testified that there was not "a lot of evidence" for a cognitive disorder, citing a statement from

---

[12]The ALJ should also consider on remand plaintiff's challenge to Dr. Khorshidi's credibility based on her disciplinary history. (Pl.'s Br. at 19-20.) In Radosevich v. Berryhill, No. 16-C-1119, 2017 U.S. Dist. LEXIS 150936, at *39-41 (E.D. Wis. Sept. 18, 2017), the court rejected a similar challenge because the claimant failed to offer evidence of the disciplinary actions at the hearing. Id. at *41. Here, plaintiff did raise the issue with the ALJ in a pre-hearing brief (Tr. at 338), although it appears he submitted the actual disciplinary decision later to the Appeals Council (Tr. at 407). The matter must be remanded for other reasons, so I need not decide whether this issue alone would warrant remand.

[13]Plaintiff later argues that assuming, arguendo, the agency consultant opinions are entitled to weight, the ALJ failed to include in the hypothetical and the RFC certain "moderate" limitations recommended by the agency psychologists. (Pl.'s Br. at 22-23.) If the consultants did not actually prepare the reports, there would be no basis for including the medical opinions contained therein in the RFC. The ALJ may on remand decide whether the agency consultants actually prepared the reports and, if so, whether the RFC should be modified to account for any of the limitations they contain.

29

Dr. Werner that "her memory is intact." (Tr. at 72.) As counsel pointed out on cross-examination, Dr. Werner was plaintiff's cardiac surgeon, not a mental health professional, and in any event Dr. Werner was sufficiently concerned about plaintiff's post-surgical cognitive functioning that he referred her for testing with Dr. Kula. (Tr. at 73-74.) Counsel also pointed out the results of Dr. Kula's tests, and Dr. Cremerius did not dispute the validity of the testing. (Tr. at 74-75.) When counsel attempted to relate particular test scores to plaintiff's ability to learn a job, Dr. Cremerius stated: "Well, here's the problem with what you're doing, sir; you're picking one or two scores that are really low. We could pick one or two scores that are higher also. My testimony is on the overall performance of that test, and that's where I came up with my restrictions." (Tr. at 77.) Counsel then asked: "So you do disagree with Dr. Kula's assessment in terms of her restrictions?" Dr. Cremerius responded: "I don't think so, no." (Tr. at 77.) Counsel reiterated Dr. Kula's conclusion that plaintiff "is unable to work at this time." (Tr. at 78.) Dr. Cremerius responded, "And I would agree she'd have difficulties with complex tasks, and that's why I'm offering the restrictions I am." (Tr. at 78.) Counsel tried again:

> Q      Do you agree that she would be unable to meet the cognitive demands of work?
>
> A      With the restrictions I'm offering, she should be fine.
>
> Q      So you disagree with Dr. Kula?
>
> A      I'm just saying I think that the restrictions I'm offering are generally consistent with his review as well as the rest of the file evidence. . . . I don't think I'm disagreeing with him.

(Tr. at 78.)

The ALJ did not reconcile the apparent conflict between Dr. Cremerius's conclusion that plaintiff could perform simple, unskilled work, and his testimony that he did not disagree with

Dr. Kula's assessment. The ALJ did note Dr. Cremerius's testimony that his opinions were based on the overall record, including all of the plaintiff's test scores, not just certain poor scores. (Tr. at 37.) However, neither Dr. Cremerius nor the ALJ explained what additional evidence in the record undermined Dr. Kula's conclusions based on the test scores. The record does not, for instance, contain later neuro-psychological or similar testing on which plaintiff did better. Nor did the ALJ or Dr. Cremerius explain how looking at all of Dr. Kula's test scores would lead one to conclude that plaintiff retained the ability to perform simple work. Dr. Cremerius cited one sub-test where plaintiff scored in the 50th percentile, placing her in the average range. (Tr. at 76.) Based on my review of Dr. Kula's report, it appears that the other scores were quite low, placing her in the following percentiles: 18th, 3rd, 5th, 5th, 2nd, 2nd, 6th, 2nd, 1st, below 0.03, 5th, below the 1st, 1st, 4th, 18th, 3rd, 3rd, and below 0.03.[14] (Tr at 598-99.)

This is not to say that the ALJ was required to accept Dr. Kula's opinion and find plaintiff disabled based on low test scores. But it does not suffice to say, without further explanation, that the "overall record" permits crediting the testimony of Dr. Cremerius, a non-examining consultant, over the detailed report of examining source Dr. Kula.[15] See Beardsley, 758 F.3d at 839 (noting that under the regulations more weight is generally given to the opinion of a source who has examined the claimant than to the opinion of a source who did not, and holding that the ALJ did not provide a valid explanation for preferring a record reviewer's analysis over

---

[14]She did place in the "normal range" on the Folstein Neurocognitive Mini Mental Status Exam. (Tr. at 599.)

[15]I agree with the Commissioner that Dr. Cremerius did not have to "invalidate" Dr. Kula's test results in order to draw his own conclusion that plaintiff could work. (Def.'s Br. at 16.) However, it is hard to see how Dr. Cremerius could testify that his opinion was "generally consistent" with Dr. Kula's. (Tr. at 78.)

31

that of an examining doctor).[16]  The matter must be remanded.

In addition to reevaluating cognitive limitations, the ALJ should on remand consider whether additional manipulative limitations are warranted based on Dr. Kula's testing, which revealed "severely impaired functioning with regards to her capabilities in the areas of visual analysis and spatial representation, sensory-motor integration, graphomotor reproduction, fine motor skill control and dexterity, as well as visual mapping."  (Tr. at 598-99.)  Dr. Cremerius testified that he did not take into account any physical limitations plaintiff might have.  (Tr. at 78-79.)  The Commissioner contends that the ALJ was not required to parse out each limitation given by Dr. Kula but only to show that he considered Dr. Kula's report and to give reasons for affording it some weight.  (Def.'s Br. at 16.)  SSR 96-2p states:

> It is not unusual for a single treating source to provide medical opinions about several issues; for example, at least one diagnosis, a prognosis, and an opinion about what the individual can still do.  Although it is not necessary in every case to evaluate each treating source medical opinion separately, adjudicators must always be aware that one or more of the opinions may be controlling while others may not.  Adjudicators must use judgment based on the facts of each case in determining whether, and the extent to which, it is necessary to address separately each medical opinion from a single source.

1996 SSR LEXIS 9, at *5-6.  In the present case, given the requirements of plaintiff's past work as generally performed, which include frequent reaching and handling, and occasional fingering (Pl.'s Br. at 23; R. 18-1 at 2), plaintiff's issues with motor skill control and dexterity would seem important to her ability to do this job.  The Commissioner argues that the ALJ reasonably

---

[16]The Commissioner notes the ALJ's finding that Dr. Kula was not a treating source, as he saw plaintiff for purposes of testing.  (Def.'s Br. at 15.)  This meant Dr. Kula's report could not receive controlling weight, see White v. Barnhart, 415 F.3d 654, 658 (7th Cir. 2005), but he still had the advantage of examining plaintiff.  The Commissioner also notes Dr. Cremerius's longitudinal knowledge of the record (Def.'s Br. at 15), but as discussed in the text the ALJ did not explain what in the record supported Dr. Cremerius's opinion over Dr. Kula's.

accounted for plaintiff's left arm problems in the RFC.  (Def.'s Br. at 16.)  However, he included only a limitation on overhead reaching, not reaching in general or in handling or fingering.

## C.    Vocational Issues

Plaintiff first argues that the ALJ erred by failing to elicit information regarding how she actually performed the job of housekeeper.  (Pl.'s Br. at 24.)  As courts have noted, however, such errors are harmless if the ALJ concludes that the claimant can do her past work as generally performed.  E.g., Reynolds v. Colvin, No.: 1:14-cv-00441-SEB-DML, 2015 U.S. Dist. LEXIS 113022, at *10 (S.D. Ind. August 5, 2015) ("If she can do either, then she is not disabled at step four."), adopted, 2015 U.S. Dist. LEXIS 112224 (S.D. Ind. Aug. 24, 2015).

Plaintiff also takes issue with the VE's testimony that the housekeeper job qualified as simple work of a routine and repetitive type.  (Pl.'s Br. at 25.)  As indicated above, plaintiff's counsel questioned the VE on this issue at length, but she maintained her opinion.  (Tr. at 92-94.)  Plaintiff disagrees with the VE, but she alleges no conflict with the DOT or other reliable source on this issue, nor did she offer any vocational evidence of her own.

Finally, plaintiff argues that the VE's testimony regarding public contact conflicted with the DOT.  (Pl.'s Br. at 26.)  She notes that the hypothetical relied on by the ALJ included a limitation of no contact with the general public, yet the DOT states a housekeeper "renders personal assistance to patrons."[17]  In a post-hearing interrogatory response, the VE stated that her testimony was not inconsistent with the DOT, noting that the DOT "doesn't discuss issues such as the amount or type of interactions with other people."  (Tr. at 355.)  She further stated that her testimony on this (and other issues not addressed in the DOT) was based on her

---

[17]https://occupationalinfo.org/32/323687014.html.

experience. (Tr. at 355.) The ALJ accepted that explanation. (Tr. at 39-40.)

When the DOT is silent on a subject, the VE does not create a conflict by filling in the gap based on her knowledge and experience. See Zblewski v. Astrue, 302 Fed. Appx. 488, 494 (7th Cir. 2008). But that is not the case here; the DOT clearly states that a housekeeper will have public contact rendering assistance to "patrons." When a conflict arises, the ALJ is not required to accept the DOT's job description; rather, he is "entitled to accept testimony of a vocational expert whose experience and knowledge in a given situation exceeds that of the Dictionary's authors." Donahue v. Barnhart, 279 F.3d 441, 446 (7th Cir. 2002). But again that is not this case; the VE claimed there was no inconsistency, and the ALJ agreed that her statements were "generally consistent" with the DOT. (Tr. at 39.)

The Commissioner argues that the ALJ did all that was required; he recognized the possible conflict and obtained an explanation from the VE. (Def.'s Br. at 18.) But the ALJ is required to do more than obtain an explanation; he must also resolve the conflict. Here, rather than resolving the conflict, the ALJ accepted the VE's claim that there was no conflict, when plainly there was. The ALJ further stated that "the vocational expert reported that any deviation from the Dictionary of Occupational Titles was based upon her own experience and gave job numbers accordingly." (Tr. at 39-40.) It is unclear what he meant by this; this case was decided at step four; the VE gave no job numbers at step five. Perhaps on remand a VE could explain how, based on her knowledge and experience, a person can work as a maid with no public contact. But the present record is insufficient to accept that conclusion. The matter must be remanded for resolution of this issue.

## IV. CONCLUSION

In her main brief, plaintiff seeks reversal and remand "with an order that the

34

Commissioner award benefits because the record requires it." (Pl.'s Br. at 28.) In the alternative, she seeks remand for rehearing.

When the court's reverses an ALJ's decision, the ordinary remedy is remand for further proceedings. Kaminski v. Berryhill, 894 F.3d 870, 2018 U.S. App. LEXIS 18582, at *11 (7th Cir. July 9, 2018). An award of benefits is appropriate "only if all factual issues involved in the entitlement determination have been resolved and the resulting record supports only one conclusion – that the applicant qualifies for disability benefits. Allord v. Astrue, 631 F.3d 411, 415 (7th Cir. 2011). Plaintiff makes no attempt to satisfy this demanding standard, and the errors identified in this decision are of the sort appropriately addressed on remand. See, e.g., Roxbury v. Colvin, No. 13-C-1385, 2014 U.S. Dist. LEXIS 115204, at *46-47 (E.D. Wis. Aug. 19, 2014).

**THEREFORE, IT IS ORDERED** that the ALJ's decision is reversed, and the matter is remanded for further proceedings consistent with this decision. The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 25th day of September, 2018.

/s Lynn Adelman
LYNN ADELMAN
District Judge

35